## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TK SERVICES, INC., c/o *Jeffery T. Martin, Jr.*
*Henry & O'Donnell, PC*
*300 N. Washington St.*
*Suite 204*
*Alexandria VA 22314*

         **Plaintiff,**

v.

RWD CONSULTING, LLC,
Serve registered agent: Robert W. Dozier, Jr.
1612 7th St. NW
Washington, DC 20001,

         **Defendant.**

Case: 1:17-cv-01152
Assigned To : Jackson, Amy Berman
Assign. Date : 6/13/2017
Description: TRO/PI     **(D-Deck)**

## COMPLAINT

COMES NOW TK Services, Inc. ("TKS" or "Plaintiff"), by counsel, and files this Complaint against the defendant RWD Consulting, LLC ("RWD" or "Defendant"), stating as follows:

### PARTIES

1.    Plaintiff is a Virginia Corporation with a principal place of business in Alexandria, Virginia.

2.    Defendant is a Maryland limited liability company with a principal place of business in the District of Columbia.

### JURISDICTION / VENUE

3.    For purposes of 28 U.S.C. § 1332(a), Plaintiff is a citizen of Virginia.

4.    For purposes of 28 U.S.C. § 1332(a), Defendant is a citizen of Maryland. The Plaintiff is a citizen of a state in which the Defendant is not domiciled. The amount in

Kevin M. O'Donnell, Fed. Bar No. VA30086
Jeffery T. Martin, Jr., Fed. Bar No. VA71860
HENRY & O'DONNELL, P.C.
Counsel to TK Services, Inc.
300 N. Washington St., Suite 204
Alexandria, VA 22314
(703) 548-2100

**RECEIVED**

**JUN 13 2017**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

controversy exceeds $75,000, exclusive of interest and costs. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Defendant's principal place of business is in the District of Columbia and a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of this action is situated, in the District of Columbia.

## INTRODUCTION

6.      On March 23, 2017, Defendant began a concerted scheme of embezzlement and theft of cash, equipment, and contractual expectancies from TKS. RWD unilaterally removed all funds that belonged to TKS from a jointly controlled bank account (which is expressly prohibited by the agreement between the parties) and wrongfully excluded TKS from access and control over work that TKS is contractually obligated to perform. As a result, TKS is being continuously damaged by this exclusion.

## FACTS COMMON TO ALL COUNTS

7.      TKS is a Virginia corporation, founded in 1999, with a principal place of business in Springfield, Virginia, and engaged principally in the business of government contracting. TKS specialized in the provision of engineering, maintenance and operational services for certain government facilities managed by the General Services Administration ("GSA").

8.      RWD is a Maryland limited liability company, founded in 2007, with a principal place of business in the District of Columbia. At all relevant times RWD is and has been 100% owned and managed by Robert W. Dozier, Jr. ("Dozier").

9.      In or around early 2016, TKS and RWD began discussions about a proposal for joint cooperation and participation in the performance of a potential sub-contracting opportunity

which involved the provision of operations and maintenance related services for the EPA-ICC headquarters building located at 1201 Constitution Avenue, NW, Washington DC 20004 (the "EPA Building"). TKS was aware of the subcontract opportunity because at that time it was the approved subcontractor to Chimes DC ("Chimes") which held the prime contract for the provision of all management, operations and maintenance of the EPA Building through a contract with the United States Government by and through the General Services Administration ("GSA").

10.     In early 2016, TKS possessed the knowledge, experience and had the retained personnel sufficient to provide for the delivery of services required under the subcontracting opportunity at the EPA Building. RWD, on the other hand, was certified under the U.S. Small Business Administration's 8(a) business development program, which was a subcontract requirement for the contract period subsequent to June 30, 2016.

11.     In contemplation of jointly cooperating and participating in the subcontracting opportunity, TKS and RWD entered into a Mentor Subcontractor's Service Agreement ("Mentor Agreement") on February 23, 2016 under which TKS was to provide certain services to RWD with respect to the subcontracting opportunity.  A true and correct copy of the Mentor Agreement is attached hereto as **Exhibit A** and is hereby incorporated by reference.

12.     Subsequent to the execution of the Mentor Agreement, and after submission of proposals jointly developed by TKS and RWD, Chimes awarded a Subcontract Agreement dated as of July 1, 2016 (the "Chimes Contract") to RWD. Under the Chimes Contract, RWD became the prime subcontractor responsible for the provision of operation and maintenance related services for the EPA Building. Thereafter, TKS and RWD agreed and intended that work

performed under the Chimes Contract as allocated to RWD would be allocated and performed in accordance with the terms and conditions of the Mentor Agreement.

13.     At all times relevant to the allegations made in this Complaint, Chimes was aware of, and expressly approved of, the joint participation by TKS with RWD in the discharge of duties required under the Chimes Contract.

14.     Because TKS had been performing this same subcontract work up through June 30, 2016, all parties agreed that TKS' continued involvement would enhance and help facilitate RWD's performance under the Chimes Contract.

15.     The Mentor Agreement provided for the allocation of duties between TKS and RWD under the Chimes Contract and further provided for the financial management and compensation allocable to each party in connection with the performance of the Chimes Contract.

16.     The Mentor Agreement provided that TKS was to manage substantially all of the work required under the Chimes Contract, and, in exchange, TKS was to receive all profits from such contract less payments to RWD in the amount of $5,000 per month. The Mentor Agreement had a term of May 1, 2016 through April 30, 2020, including option years. TKS discharged its obligations under the requirements of the Mentor Agreement by providing all administrative and managerial related services necessary to contract performance and administration.

17.     The Mentor Agreement required that all funds attributable to the Chimes Contract were to be deposited in a joint account which would require the signature of both TKS and RWD for any checks or other withdrawals (the "Deposit Account"). Both parties were to have access to the Deposit Account, but funds were only to be withdrawn under the terms of the Mentor

4

Agreement. While TKS was provided online access to the Deposit Account, upon information and belief, the Deposit Account was opened by RWD in a manner which did not comply with the joint signature requirements of the parties and which permitted RWD to thereafter improperly remove all funds from said account.

18.     The Mentor Agreement expressly provided that TKS was to be the source of all working capital for the work to be done on the Chimes Contract, and it expressly prohibited RWD from withdrawing any portion of the Working Capital, as defined therein. TKS fully complied with its capital requirements under the Mentor Agreement, ultimately contributing over $140,000.00 in capital required to commence and continue work under the Chimes Contract.

19.     The Mentor Agreement also governs the distributions of profits that arise from ancillary reimbursable projects that were in addition to and separate from the Chimes Contract (the "Reimbursable Projects). Under the Mentor Agreement, the profits from the Reimbursable Projects were to be distributed 51% to RWD and 49% to TKS.

20.     From July 1, 2016 forward (until it was excluded from access to the EPA Building), TKS fully complied with the Mentor Agreement and managed all work under the Chimes Contract. During the nine month period from July 1, 2016 through February 28, 2017, TKS was entitled to a payment of $275,051.47 representing the profits attributable to the Chimes Contract for that period, and of which only $210,000 was previously paid. Distribution of profits to TKS was to be made monthly, but was not performed as required under the Mentor Agreement.

21.     RWD was paid in full for the $5,000 per month to which it was entitled.

22.     Additionally, for the period of July 1, 2016 through March 24, 2017, TKS was entitled to receive 49% of the profit ($38,121.31) that was attributable to the Reimbursable

Projects. These payments were also required to be made monthly under the Mentor Agreement, but to date, no payment has been made to TKS for this work which was fully paid for and completed.

23.     TKS supplied all required Working Capital for the Chimes Contract as well as the Reimbursable Projects, as well as all equipment that was to be used in the fulfillment of the Chimes Contract. Upon information and belief, the equipment has a value exceeding $22,500.00.

24.     On March 23, 2017, with no explanation or prior warning, RWD withdrew all funds from the Deposit Account, which totaled approximately $35,000 and included both profits and Working Capital. All of these funds belonged solely to TKS. Thereafter, RWD terminated TKS' online access to the Deposit Account.

25.     Thereafter, RWD acted to exclude TKS from access to the EPA Building and acted to effect a unilateral and purported termination of the Mentor Agreement.

26.     Any purported termination of the Mentor Agreement by RWD was invalid for failure to follow express termination provisions of such agreement. Specifically, the Mentor Agreement provides that prior to any termination, RWD is required to provide written notice to TKS of any alleged default thereunder, and that TKS would have a period of not less than thirty (30) days to effect a cure of any such alleged default.

27.     RWD's unilateral action to immediately terminate the Mentor Agreement was made without prior written notice expressly required thereunder. RWD has continued since March 23, 2017, to wrongfully prevent TKS from access to the EPA Building and from the ability to discharge its duties under the Mentor Agreement.

28.     Upon information and belief, RWD has swept and retained all net profits attributable to the Chimes Contract subsequent to March 23, 2017, and has failed and refused to make payments or turn over funds required to be paid to TKS under the Mentor Agreement.

29.     Upon information and belief, a minimum of $34,000 per month in profits for the months of March and April, 2017 has been diverted directly to RWD in derogation of TKS's rights under the Mentor Agreement.

30.     TKS continues to be damaged at the rate of approximately $34,000 per month for every month which it is excluded from the EPA Building and is prevented from performing its duties under the Mentor Agreement.

31.     In addition, RWD has retained, and has failed to return or compensate TKS for the value of, equipment supplied by TKS for the performance of the Chimes Contract. As noted above, such equipment has a value exceeding $22,500.00.

<u>COUNT ONE – Breach of Contract</u>

32.     The allegations contained in paragraphs 1 through 31 are incorporated by reference as if fully set forth herein.

33.     The Mentor Agreement is a valid, enforceable contract between TKS and RWD.

34.     TKS fully complied with all terms of the Mentor Agreement and was not in breach thereof on March 23, 2017.

35.     Pursuant to the terms of the Mentor Agreement, as of March 23, 2017, TKS was entitled to be paid the remaining $65,051.47 balance owed as its share of profits from the Chimes Contract.

36.     TKS is also entitled to be paid approximately $34,000 each for the months of March and April, 2017, and for every subsequent month thereafter through the April 2020 termination date of the Chimes Contract.

37.     Additionally, TKS is entitled to $38,121.31 for its work on the Reimbursable Projects performed through March 23, 2017, plus 49% of any profits generated from subsequent Reimbursable Projects through the expiration of the Chimes Contract.

38.     RWD breached the Mentor Agreement by i) breaching its duty to open the Deposit Account as a joint account with a required signatory of TKS, ii) sweeping all funds from the Deposit Account and cancelling TKS' access thereto, iii) preventing TKS from having access to the EPA Building and preventing TKS from performing its duties under the Mentor Agreement, and iv) acting to effect an improper and unilateral termination of TKS under the Mentor Agreement.

39.     The actions of RWD in breaching the Mentor Agreement have caused damages to TKS in an amount not less than $1,413,500.00, including, but not limited to, i) the liquidated sums identified herein and payable to TKS for services rendered through February 28, 2017, ii) the actual net profit attributable to the Chimes Contract for the period subsequent to February 28, 2017, and iii) all net profits otherwise payable to TKS under the Mentor Agreement through the expiration of the Chimes Contract.

COUNT TWO – Conversion

40.     The allegations contained in paragraphs 1 through 39 are incorporated by reference as if fully set forth herein.

41.     The funds that were in the Deposit Account as of March 23, 2017 belonged to TKS.  RWD has no right to these funds.

8

42.     The equipment supplied by TKS for performance of responsibilities under the Chimes Contract belongs to TKS. RWD has no right to this equipment.

43.     All subsequent funds that have been paid to RWD under the Chimes Contract (with the exception of $5,000 per month plus 51% or the profit from the Reimbursable Projects) are properly payable to and belong to TKS. RWD has no right to these funds.

44.     RWD has knowingly and willfully misappropriated the funds and equipment referenced herein.

45.     Despite requests, RWD has failed and refused to return the funds and equipment over which it is unlawfully exercising dominion.

46.     RWD's withdrawal of the funds from the Deposit Account was not previously agreed upon, was intentional, without permission or justification, and constitutes a conversion of TKS's property.

47.     RWD's refusal to return possession of the equipment to TKS, and RWD's exercise of dominion and control over such equipment to the exclusion of TKS and without permission or justification, constitutes a conversion of TKS's property.

48.     RWD's misappropriation of profits from the Chimes Contract properly payable to TKS for the months of March and April 2017, as well as RWD's continuing misappropriation of all subsequent profits from the Chimes Contract payable to TKS, constitutes a continuing conversion of TKS's property.

49.     RWD's failure to return the funds or equipment, and to continue to misappropriate funds properly payable to TKS, constitutes bad faith and other nefarious conduct for which the Court should award TKS its reasonable attorney's fees and costs.

50.     RWD is subject to liability for its aforementioned wrongful conduct.

51.    TKS has suffered damages as a result of the aforementioned wrongful conduct in an amount of at least $200,000, the precise amount to be proved at trial.

COUNT THREE — Unjust Enrichment

52.    The allegations contained in paragraphs 1 through 51 are incorporated by reference as if fully set forth herein.

53.    Each of i) the liquidated sums identified herein and payable to TKS for services rendered through February 28, 2017, ii) the actual net profit attributable to the Chimes Contract for the period subsequent to February 28, 2017, iii) equipment supplied by TKS for performance of the Chime Contract, and iv) all net profits otherwise payable to TKS under the Mentor Agreement through the expiration of the Chimes Contract, constitute money, property or future entitlements to money which belong exclusively to TKS.

54.    By virtue of its wrongful attempts to terminate TKS under the Mentor Agreement, RWD is now in exclusive possession of the money and property of TKS as referenced herein, is expected to recover and obtain possession of the future entitlements to money which belong to TKS under the Mentor Agreement, and is apparently using and expending such money for its own benefit to the detriment and exclusion of TKS.

55.    Despite requests, RWD has failed and refused to return the funds and equipment over which it is unlawfully exercising dominion. RWD has acted to conceal the exact amounts that are being realized pursuant to the Chimes Contract by blocking TKS's access to the Deposit Account.

56.    The retention by RWD of TKS property and money as referenced herein is unjust, in that, it permits RWD to profit from an impermissible attempt to unilaterally terminate the Mentor Agreement and to literally strip TKS of valuable economic rights otherwise granted to

TKS by contractual agreement made with RWD. The retention of these assets by RWD permits them to profit from their own misconduct.

57. Because of the improper retention by RWD of money and property belonging to TKS, RWD has been unjustly enriched and should be directed to immediately surrender and pay to TKS i) the liquidated sums identified herein and payable to TKS for services rendered through February 28, 2017, ii) the actual net profit attributable to the Chimes Contract for the period subsequent to February 28, 2017, iii) equipment supplied by TKS for performance of the Chime Contract, and iv) all net profits otherwise payable to TKS under the Mentor Agreement through the expiration of the Chimes Contract

58. RWD's failure to return the funds and property of TKS constitutes bad faith and other nefarious conduct for which the Court should additionally award TKS its reasonable attorney's fees and costs.

59. TKS has suffered damages as a result of the aforementioned wrongful conduct and unjust enrichment in an amount of at least i) the liquidated sums identified herein and payable to TKS for services rendered through February 28, 2017, ii) the actual net profit attributable to the Chimes Contract for the period subsequent to February 28, 2017, and iii) all net profits otherwise payable to TKS under the Mentor Agreement through the expiration of the Chimes Contract.

COUNT FOUR – Equitable and Injunctive Relief

60. The allegations contained in paragraphs 1 through 59 are incorporated by reference as if fully set forth herein.

61. RWD has acted in bad faith to deprive and conceal from TKS funds and property to which TKS is legally entitled.

62.    RWD continues to exclude TKS from the EPA Building, to deny TKS its rights and benefits under the Mentor Agreement, and to deny TKS access to the Deposit Account. These actions have been taken by RWD in an improper and bad faith act of attempting a unilateral termination of the Mentor Agreement.

63.    Upon information and belief, RWD has misappropriated the liquidated sums belonging to TKS as well as the profits of March and April 2017 under the Chimes Contract, and is now utilizing and expending those funds for its own behalf and/or in distribution to principals and shareholders of RWD.

64.    Upon information and belief, the funds wrongfully appropriated from TKS are being expended by RWD, such that, recovery will prove largely impossible and TKS will be irreparably harmed.

65.    RWD should be ordered to make an accounting of all funds it has received under the Chimes Contract and any payment of expense or distribution that has occurred with the funds.

66.    Given the demonstrated and continuous acts of concealment and exclusion with respect to funds paid under the Chimes Contract, the Court should exercise is substantial equitable and injunctive powers to prevent further actions by RWD including pre-judgment attachment of funds that are continuing to be converted by RWD and the entry of injunctive orders i) ordering the sequestration of all profits recoverable under the Chimes Contract, ii) preventing RWD from excluding TKS from the EPA Building and access to the Deposit Account, and iii) reinstating TKS to its duties under the Mentor Agreement.

67.    Because RWD has acted in bad faith, it should be liable for any attorney's fees or costs incurred by TKS as a result of RWD's wrongful actions.

68.    TKS should be granted all equitable and injunctive relief to which it may be entitled so as to be compensated for any damages it has incurred and to restrain and repair any wrongful acts by RWD.

### PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, TKS respectfully requests that this Court GRANT IT THE FOLLOWING RELIEF:

a.  enter judgment in favor of TKS and against RWD in an amount to be determined at trial and not less than $1,413,500.00, and equal to at least: i) the liquidated sums identified herein and payable to TKS for services rendered through February 28, 2017, ii) the actual net profit attributable to the Chimes Contract for the period subsequent to February 28, 2017, and iii) all net profits otherwise payable to TKS under the Mentor Agreement through the expiration of the Chimes Contract, with interest at 6% from March 23, 2017 until paid, plus post-judgment interest;

b.  enter any equitable relief to which it may be entitled;

c.  enter an order that RWD provide an accounting;

d.  enter an order enjoining RWD from excluding TKS from access to the Deposit Account and the Premises;

e.  enter judgment in favor of TKS and against RWD for its attorney's fees and costs incurred herein, the precise amount to be proved at trial, plus prejudgment and post-judgment interest; and

f.  for such other and further relief as this Court deems just and equitable.

TK SERVICES, INC.
By counsel

/s/ Jeffery T. Martin, Jr.
Kevin M. O'Donnell, Fed. Bar No. VA30086
Jeffery T. Martin, Jr., Fed. Bar No. VA71860
HENRY & O'DONNELL, P.C.
Counsel to TK Services, Inc.
300 N. Washington St., Suite 204
Alexandria, VA 22314
Telephone: (703) 548-2100
Fax: (703) 548-2105
JTM@henrylaw.com
Counsel to TK Services, Inc.

## MENTOR SUBCONTRACTOR'S SERVICE AGREEMENT

This AGREEMENT ("Agreement") is entered into this, 24th day of February 2016 between **RWD Consulting LLC,** located at 1612 7th Street NW, Washington DC 20001 ("PRIME CONTRACTOR") and **TK Services, Inc.,** located at 1000 Bernard Street, Alexandria VA 22314 ("SUBCONTRACTOR") for the performance of SERVICES at the FACILITY outlined in EXHIBIT "A" ("FACILITY"). The CLIENT is outlined in EXHIBIT "A" ("CLIENT"). RWD Consulting, LLC and TK Services, Inc. are referred to collectively herein as the "PARTIES" and individually as a "PARTY".

PRIME CONTRACTOR and SUBCONTRACTOR Mutually Agree as follows:

1. **TERM.** The TERM of this Agreement is specified in EXHIBIT "A".

2. **SUBCONTRACTOR'S SERVICES.** SUBCONTRACTOR agrees to perform the services and scope of work as described in EXHIBIT "A". These services are hereinafter called "SERVICES".

SUBCONTRACTOR agrees and warrants, in connection with all SERVICES required by this Agreement, that it will not violate, and shall comply with all applicable laws, ordinances, regulations and orders of governmental authorities, whether enacted and in force now or in the future.

During the negotiation of this contract, PRIME CONTRACTOR has required evidence of SUBCONTRACTOR's qualifications and is executing this contract based on those representations. PRIME CONTRACTOR expects SUBCONTRACTOR to implement those representations as part of the Services provided. SUBCONTRACTOR and PRIME CONTRACTOR will mutually work out appropriate hours for the SERVICES to be provided and appropriate SUBCONTRACTOR labor, employees, and subcontractors to perform such services. Once such schedules are agreed upon, SUBCONTRACTOR agrees to abide by such schedules and provide SERVICES in accordance with the schedules.

3. **TERMINATION OF AGREEMENT.**

3.1  SUBCONTRACTOR shall promptly take all action necessary to fully comply with the terms of this Agreement within thirty (30) days after PRIME CONTRACTOR gives written notice that SUBCONTRACTOR's performance under this Agreement is unsatisfactory, that SUBCONTRACTOR has failed to comply fully with the terms of this Agreement, or that the SERVICES need correction or repair. Should SUBCONTRACTOR fail to fully comply with the terms of this Agreement within said timeframe, PRIME CONTRACTOR may terminate this Agreement with thirty (30) days written notice.

3.2  This Agreement will be terminated if CLIENT has exercised its rights under 52.212-4(1) to terminate for convenience under PRIME CONTRACTOR's PRIME CONTRACT.

3.3  The CLIENT has legally declined to exercise an option period under PRIME CONTRACTOR's PRIME CONTRACT.

_Subcontractor Initials_     _Prime Contractor's Initials_

**Contract 2016-01**

1

**EXHIBIT A**

3.4 In the event of any termination under Clause 4, PRIME CONTRACTOR shall pay all valid charges and other sums otherwise due hereunder for SERVICES provided prior to such termination in accordance with FAR 52.212-4(1). The obligation to pay the sums described in this Clause survives termination of the Agreement.

4. **CONFIDENTIAL INFORMATION**. All SERVICES performed under this Agreement are covered by the pre-existing Mutual Non-Disclosure Agreement found in the Standard Teaming Agreement – Exhibit "B".

5. **CONFLICT OF INTEREST**. Each PARTY represents that its execution and performance of this Agreement does not conflict with or breach any contractual, fiduciary or other duty or obligation to which it is bound. Each PARTY will not perform work for any other business organizations or entities, which would create an actual or potential conflict of interest or which is detrimental to the other PARTY's business interests.

6. **NOTICES**. All notices, certificates, acknowledgements or other written communications required to be given under this Agreement shall be in writing and shall be deemed to have been given and properly delivered if duly mailed by certified or registered mail to the other PARTY at its address as follows, or to such other address as either Party may, by written notice, designate to the other. Additionally, Notices sent by any other means (i.e. email, facsimile, overnight delivery. Courier, and the like) are acceptable subject to written confirmation of both the transmission and the receipt of the Notice.

| SUBCONTRACTOR | PRIME CONTRACTOR |
|---|---|
| TK Services, Inc. | RWD Consulting, LLC |
| 1000 Bernard Street | 1612 7th Street NW |
| Alexandria, VA 22314 | Washington, DC 20001 |
| Name: John Harris | Name: Robert Dozier |
| Tel: 571-436-1400 | Tel: 202-588-5088 |
| Fax: 703-504-6119 | Fax: 202-588-5188 |
| Email: jharris@tkservicesinc.com | Email: rdozierjr@rwdconsultingllc.com |

7. **MODIFICATIONS/NON-WAIVER RIGHTS**. This Agreement shall not be amended, modified or extended, nor shall any waiver of any right hereunder be effective, unless set forth in a document executed by duly authorized representatives of both PARTIES, specifically referencing the provision of this Agreement to be amended, modified, extended or waived. The failure of either PARTY to insist upon performance of any provision of this Agreement, or to exercise any right, remedy or option provided herein, shall not be construed or deemed as a waiver of the right to assert any of the same at any time thereafter.

8. **FORCE MAJEURE**. Neither PARTY shall be liable for any failure to perform under this Agreement when such failure is due to causes beyond that PARTY's reasonable control, including, but not limited to, acts of state or governmental authorities, acts of terrorism, natural catastrophe, fire, storm, flood, earthquakes, accident, and prolonged shortage of energy.

9. **ASSIGNMENT**. This Agreement may not be assigned, novated or otherwise transferred by operation of law or otherwise by either PARTY without the prior written consent of the other

_____
Subcontractor Initials

_____
Prime Contractor's Initials

**Contract 2016-01**

2

PARTY, which consent shall not be unreasonably withheld. Any change of control of a PARTY shall be deemed an assignment of this Agreement that requires the prior written consent of the other PARTY. For purposes of this Agreement, "change of control" means any merger, consolidation, sale of all or substantially all of the assets or sale of a substantial block of stock, of a PARTY. Any such assignment, novation or transfer by one PARTY not in accordance with this provision shall be a material breach of this Agreement and shall be grounds for immediate termination thereof by the non-breaching PARTY, in addition to other remedies that may be available at law or in equity to the non-breaching PARTY.

10. **SEVERABILITY**. If any term, condition or provision of this AGREEMENT is held or finally determined to be void, invalid, illegal, or unenforceable in any respect, in whole or in part, such term, condition or provision shall be severed from this Agreement, and the remaining terms, conditions and provisions contained herein shall continue in force and effect, and shall in no way be affected, prejudiced or disturbed thereby.

11. **ARBITRATION.** Any controversy or claim between the PARTIES arising out of or in connection with this Agreement, including any claim concerning an alleged breach hereof, shall be subject to final settlement by arbitration. Notice of demand by any PARTY for arbitration of any matter must be given to the other PARTIES within one (1) year from the date on which the controversy occurred or the claim arose.

The arbitration shall be conducted by a single arbitrator in accordance with the Rules of Arbitration of the American Arbitration Association, as then in effect. If and to the extent that it is necessary or appropriate to refer to and apply the law of a particular jurisdiction in reaching a decision on any matter submitted to arbitration under this clause, the arbitrator shall be authorized and directed to refer to and apply the laws of the State where the FACILITY is located.

The award rendered by the arbitrator shall be final and binding on all PARTIES and judgment may be entered upon such award in any court having jurisdiction over the PARTY against which the award is sought to be enforced. In no event shall this paragraph be construed as conferring upon any court authority to inquire into and review any such award on its merits. Each PARTY shall bear its own costs in connection with any arbitration proceedings, except that fees or other charges of the arbitrator or of the American Arbitration association shall be borne equally by the Parties.

12. **CONTRACT PROVISIONS**. This written Mentor Subcontractor's Service Agreement constitutes the entire AGREEMENT between PRIME CONTRACTOR and SUBCONTRACTOR (except for modifications or amendments issued after execution of this Agreement), consisting of this document, the **GENERAL CONTRACT PROVISIONS** as set forth below, the pre-existing **Mutual Non-Disclosure Agreement** found in the Standard Teaming Agreement – **Exhibit "B"**, and the Description of SERVICES set forth in **EXHIBIT "A"**.

_____                    _____
**Subcontractor Initials**                      **Prime Contractor's Initials**

**Contract 2016-01**

3

This Agreement supersedes and replaces any and all previous or contemporaneous understandings, commitments, agreements, proposals or representations of any kind, whether oral or written, relating to the subject matter hereof except as expressly excluded in this Agreement.

This Agreement is not intended by the PARTIES to constitute or create a joint venture, limited liability company, partnership, or other formal business organization of any kind, other than a Contractor Team Arrangement as set forth in FAR Part 9.6, and the rights and obligations of the PARTIES shall be only those expressly set forth herein.

All rights, options and remedies contained in this Agreement shall be construed and held to be cumulative, and no one of them shall be exclusive of the other, and each PARTY shall have the right to pursue any one or all of such remedies or any other remedy or relief which may be provided by law, whether or not stated in this Agreement.

No Waiver by either Party of a breach of any of the terms, covenants or conditions of this Agreement shall be construed or held to be a waiver of any succeeding or preceding breach of the same or any other term, covenant or condition herein contained. No waiver of any default of SUBCONTRACTOR hereunder shall be implied from any omission by PRIME CONTRACTOR to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than is specified in said waiver. The consent or approval by PRIME CONTRACTOR to or of any act by SUBCONTRACTOR requiring PRIME CONTRACTOR's consent or approval shall not be deemed to waive or render unnecessary PRIME CONTRACTOR's consent or approval to or of any subsequent similar act by SUBCONTRACTOR.

Any dispute or matter arising under this Agreement shall be interpreted or construed, and adjudicated, under the laws of the state in which the FACILITY is located.

Any person executing this Agreement as an agent of either SUBCONTRACTOR or PRIME CONTRACTOR represents and warrants that he/she is authorized to execute this Agreement, and has the power to bind his/her respective principal to the terms, conditions and covenants of this Agreement. SUBCONTRACTOR and PRIME CONTRACTOR acknowledge that the other is relying on this warranty and representation in executing this Agreement.


**SUBCONTRACTOR:**

**TK Services, Inc.**


BY: _____

James Kim
Chief Operating Officer


**PRIME CONTRACTOR:**

**RWD Consulting, LLC**


BY: _____

Robert Dozier
President & CEO


_____
Subcontractor Initials

_____
Prime Contractor's Initials

**Contract 2016-01**

4

## GENERAL CONTRACT PROVISIONS

1. **TECHNICAL AND CUSTOMER SERVICE DIRECTION**. An individual assigned by the PRIME CONTRACTOR shall provide technical and customer service direction on the SERVICES performed. Technical direction includes clarification of contract deliverables and comments/approval on reports or other deliverables.

2. **RECORDS**. SUBCONTRACTOR shall maintain records adequate to substantiate all invoiced amounts. The PRIME CONTRACTOR and CLIENT shall have the right to examine SUBCONTRACTOR schedules, plans, books, documents or other records relating to payment for any work performed under this Agreement. The examination shall be done in accordance with FAR 4.7. PRIME CONTRACTOR will make an effort to limit the examination of records to no more than one time per year, and provide no less than thirty (30) days prior written notice to SUBCONTRACTOR and will examine RECORDS during SUBCONTRACTOR's regular business hours. SUBCONTRACTOR hereby grants the PRIME CONTRACTOR unlimited rights in, to and in respect of, any and all deliverable technical data and in and to any other computer technical data to the extent required for PRIME CONTRACTOR's performance of the PRIME CONTRACT, unless such items are agreed to be delivered with Restricted Rights or Limited Rights in any delivery order. The terms and definitions outlined above are contained in DFAR 252.227-7105.

3. **RIGHTS IN DATA AND WORKS**. Except as provided under FAR 52.227-7013 – Technical Data – Commercial Items and 252.227-7015 – Rights in Technical Data – Non-Commercial Items, the following rights in data and works will apply to the SERVICES provided by SUBCONTRACTOR under this SUBCONTRACT.

These terms do not supersede EXIBIT "B" MUTUAL NON-DISCLOSURE AGREEMENT found in the executed STANDARD TEAMING AGREEMENT.

For the purposes of this Agreement, the term INTELLECTUAL PROPERTY shall mean patented and unpatented inventions, mask works, copyrighted works, trade secrets, know-how and proprietary information either PARTY (hereinafter "INTELLECTUAL PROPERTY"). It is mutually understood and agreed that neither PARTY shall acquire, directly or by implication, any rights in any INTELECTUAL PROPERTY of the other PARTY owned, controlled, acquired, developed, authored, conceived or reduced to practice prior to the date of this AGREEMENT.

4. **PRIME CONTRACTOR REQUIREMENTS APPLICABLE**. The provisions of the PRIME CONTRACT with the CLIENT are incorporated by reference and made part hereof, as though fully set forth. If any PRIME CONTRACT clause, FAR or other provision incorporated herein refers specifically to another FAR provision as governing subcontract arrangements under the PRIME CONTRACT, then such other provision is also incorporated herein by reference and SUBCONTRACTOR and all lower-tier subcontractors shall be required to comply with its terms.

5. **INSPECTION AND APPROVALS**. The SERVICES shall be subject to inspection and approval by PRIME CONTRACTOR and all applicable CLIENT authorities; provided, however, in no event shall any such inspection and/or approval by PRIME CONTRACTOR constitute an assumption of SUBCONTRACTOR's duties and obligations or a waiver or release of liability or a

---

Subcontractor Initials          Prime Contractor Initials

Contract 2016-01

release of any other obligations whatsoever of SUBCONTRACTOR with respect to the SERVICES performed by SUBCONTRACTOR pursuant to this AGREEMENT.

6. **SECURITY CLEARANCES**. If in the performance of SERVICES pursuant to this SUBCONTRACT, it is necessary for the SUBCONTRACTOR personnel to have access to secured facilities and/or classified information, it shall be the responsibility of the SUBCONTRACTOR to comply with this requirement:

a. All applicable laws, regulations, and directives of the Government, CLIENT, and/or PRIME CONTRACTOR in reference to such secured facilities and/or security information; and

b. The requirements of the Government's Security Agreement (DD Form 441), including the National Industrial Security Program Operating Manual (DOD 522.22-M) and any revisions to that manual.

The security classification of the SERVICES to be performed shall be accomplished in accordance with the PRIME CONTRACT Security Requirements.

7. **INTERRUPTION OF WORK**. If, as a result of fire, earthquake, acts of God, war, strikes, picketing, boycott, lock-outs, or other causes or conditions beyond the control of PRIME CONTRACTOR, or if PRIME CONTRACTOR shall consider it inadvisable for SUBCONTRACTOR to proceed with the SERVICES, then SUBCONTRACTOR shall, upon receipt of written notice from PRIME CONTRACTOR, immediately discontinue any further SERVICES until such time as PRIME CONTRACTOR may deem it advisable to resume the SERVICES. SUBCONTRACTOR will resume the SERVICES promptly upon receiving written notice from PRIME CONTRACTOR to do so.

8. **COMMUNICATIONS WITH THE FACILITY/CLIENT**. Although the PRIME CONTRACTOR is contemplated as the primary interface with the FACILITY/CLIENT, it is recognized that the SUBCONTRACTOR may have continuing relations with the FACILITY/CLIENT and may be the recipient of inquiries concerning SERVICES. Therefore, any communications initiated by the FACILITY/CLIENT directly with the SUBCONTRACTOR are permissible, provided that the PRIME CONTRACTOR is notified promptly of such communications and the substance thereof, but in no event later than one business day after such communication.

9. **DISPUTES INVOLVING THE CLIENT**. In the case of any disputes between/among the CLIENT, the PRIME CONTRACTOR, and/or the SUBCONTRACTOR which is not disposed of by agreement and which involves any question of the compliance of SUBCONTRACTOR's work with the requirements of this Agreement and/or the PRIME CONTRACT, SUBCONTRACTOR hereby agrees to be bound to the PRIME CONTRACTOR to the same extent that the PRIME CONTRACTOR is bound to the CLIENT, by the terms of the PRIME CONTRACT, and by any and all final decisions or determinations made thereunder by the CLIENT, Agency board of Contract Appeals, or Court authorized or designated in the PRIME CONTRACT or by law for the resolution of disputes. In the case of any such disputes related to the SUBCONTRACTOR, PRIME CONTRACTOR hereby agrees to permit SUBCONTRACTOR to pursue the claim or dispute in question with the CLIENT (in the PRIME CONTRACTOR's name if necessary), provided that SUBCONTRACTOR allows PRIME CONTRACTOR the opportunity

---

Subcontractor Initials        Prime Contractor Initials

Contract 2016-01

to monitor and participate in any pursuit of such claim or dispute, and provided further that SUBCONTRATOR defrays its own cost of pursuing dispute procedures including attorneys' fees and related expenses.

10. **INSURANCE**. Before SUBCONTRACTOR performs any SERVICES, SUBCONTRACTOR will provide Certificates of Insurance and endorsements evidencing the following coverages by an insurance carrier satisfactory to the PRIME CONTRACTOR authorized and licensed to provide such coverages in the state in which the FACILITY is located:

| | | |
|---|---|---|
| Automobile Liability | $1,000,000 | Each Occurrence |
| Workers' Compensation | Statutory | |
| Employer's Liability | $500,000 | Each Accident |
| | $500,000 | Disease Policy Limit |
| | $500,000 | Disease Each Employee |
| General Liability | $1,000,000 | Each Occurrence |
| | $2,000,000 | General Aggregate |
| Umbrella Liability | $2,000,000 | Each Occurrence |
| | $2,000,000 | Aggregate |

The SUBCONTRACTOR shall forward to the PRIME CONTRACTOR certificates of such insurance within 30 days of execution of this Agreement. Should SUBCONTRACTOR fail to obtain any insurance coverage, or to provide any Certificate listed in this Clause or should SUBCONTRACTOR fail to timely renew any such insurance coverage, PRIME CONTRACTOR shall have the right, at PRIME CONTRACTOR's election (a) to terminate this Agreement; or (b) take any and all such other action which may be provided for by law or equity.

11. **INDEMNIFICATION**. Each PARTY ("INDEMNITOR") agrees to indemnify and hold harmless the other PARTY ("INDEMNITEE") and CLIENT against and from any loss, liability, damage, cost or expense (including reasonable attorney's fees), which may arise or result directly or indirectly from any acts or omissions of the INDEMNITOR, its employees and agents in the performance of their obligations under this Agreement. Each INDEMNITOR shall indemnify and hold harmless the other INDEMNITEE, its employees and agents from and against any claims, demands, loss, damage or expense relating to bodily injury or death of any person or damage to tangible personal or real property to the extent proximately caused by the negligent or willful acts or omission of INDEMNITOR, its employees or agents, provided INDEMNITEE shall have given INDEMNITOR prompt notice of any claim hereunder, INDEMNITOR has sole control of the defense of any such claim, INDEMNITEE cooperates fully (at the INDEMNITOR's expense) in such defense and INDEMNITEE makes no settlement or compromise of any such claim without INDEMNITOR's prior written consent.



Subcontractor Initials     Prime Contractor Initials

Contract 2016-01

# EXHIBIT A

**CLIENT:** The Chimes

**FACILITY:** EPA-ICC located at 1201 Constitution Avenue NW, Washington DC 20004

**CONTRACT SERVICES:** SUBCONTRACTOR's SERVICES are a subset of the PRIME CONTRACTOR SERVICES and the full scope of CONTRACT SERVICES provided to CLIENT under the PRIME CONTRACT will herein be called "CONTRACT SERVICES".

**SUBCONTRACTOR SERVICES:**

SUBCONTRACTOR will perform all CONTRACT SERVICES for the PRIME CONTRACT following all PRIME CONTRACT provisions except those expressly intended for PRIME CONTRACTOR.

**TERM:** This AGREEMENT will become effective on the 1<u>st</u> day of May 2016, and will continue in effect until the last day of Option Year 4 or as provided in this AGREEMENT.  If an Option Year TERM PERIOD is not renewed by CLIENT or a TERM PERIOD is shortened or extended for any reason by CLIENT, then this AGREEMENT will continue in effect until the last day of CONTRACT SERVICES.

**TERM PERIODS**
**Option Year 1** – May 1, 2016 through April 30, 2017
**Option Year 2** – May 1, 2017 through April 30, 2018
**Option Year 3** – May 1, 2018 through April 30, 2019
**Option Year 4** – May 1, 2019 through April 30, 2020

## FINANCIAL MANAGEMENT

**WORKING CAPITAL**

(a) The WORKING CAPITAL needed to meet the requirements of CONTRACT SERVICES shall be provided solely by SUBCONTRACTOR.

(b) PRIME CONTRACTOR will not withdraw any portion of WORKING CAPITAL.

(c) No borrowing charge or loan interest will be due or payable to the SUBCONTRACTOR on their WORKING CAPITAL contribution inclusive of any additional WORKING CAPITAL contribution made by SUBCONTRACTOR.

**PAYMENT TERMS**

| Subcontractor Initials | Prime Contractor Initials | 8 of 16 | Contract 2016-01 |

**DISTRIBUTION OF FUNDS – PRIME CONTRACTOR FEE:** On a Monthly basis, SUBCONTRACTOR will pay to PRIME CONTRACTOR an amount of $5,000.00 in compensation for their contribution to completing the terms of the PRIME CONTRACT regardless of PROFIT or LOSS incurred by SUBCONTRACTOR while performing the duties of the SERVICE CONTRACT.

**DISTRIBUTION OF FUNDS - SUBCONTRACTOR:** SUBCONTRACTOR will provide all labor, materials, resources, management, and other costs required to successfully complete the terms of the PRIME CONTRACT. PRIME CONTRACTOR will bear no responsibility for any costs related to the PRIME CONTRACT except those expressly related to performing the specific duties of the PRIME CONTRACTOR. With the exception of the PRIME CONTRACTOR FEE, SUBCONTRACTOR will be paid all other distributions of FUNDS from the CLIENT for the PRIME CONTRACT, facilitated through the Depository Account.

**DISTRIBUTION OF FUNDS - REIMBURSABLE PROJECTS - G&A, DIRECT & INCEDENTAL COSTS:** Each REIMBURSABLE PROJECT will be detailed by the Project Manager in conjunction with each of the PARTIES, including a complete REIMBURSABLE PROJECT BUDGET. Distribution of funds to reimburse SUBCONTRACTOR for all G&A, DIRECT, and INCEDENTAL COSTS will be made on a Monthly basis after CLIENT payment has been received in the Depository Account.

**DISTRIBUTION OF FUNDS - REIMBURSABLE PROJECTS - PROFIT**

INTERESTS OF THE PARTIES: PRIME CONTRACTOR 51% / SUBCONTRACTOR 49%

Subject to any other provisions of this AGREEMENT, the net PROFITS from REIMBURSABLE PROJECTS will accrue to the PARTIES in the proportions outlined in the INTERESTS OF THE PARTIES.

It is anticipated that Monthly distributions of PROFITS will be made to both PARTIES, after payment to SUBCONTRACTOR for G&A, DIRECT & INCEDENTAL COSTS after receiving CLIENT FUNDS in the proportions outlined in the INTERESTS OF THE PARTIES. However, if there is an actual or projected shortfall in FUNDS to cover G&A COSTS, DIRECT & INCEDENTAL COSTS, and/or REIMBURSABLE PROJECTS, PROFIT will not be distributed to either PARTY until such shortfall is mitigated.

## BANKING AND FINANCE

All banking and finance arrangements for this Agreement will adhere to the following conditions:

(a) All funds received for CONTRACT SERVICES in any form, and from any source, shall be deposited directly into a Depository Account to be opened and maintained jointly in the name of both PARTIES, with such Financial Institution as the PARTIES shall agree upon.

(b) The opening of the Depository Account and the designation of signatories with respect thereto shall be authorized or confirmed by appropriate action of the management of each PARTY, provided that the signature of all the signatories, or their designees, will be

---

Subcontractor Initials      Prime Contractor Initials

Contract 2016-01

required for all checks and drafts drawn on, and all other transactions with respect to the Depository Account.

(c) All payments due to each PARTY for performance of CONTRACT SERVICES will be deposited in their respective Depository Account.

(d) No PARTY may borrow money upon, or otherwise pledge or commit, the credit of the other PARTIES without its prior and express written consent.

## ACCOUNTING AND RECORDS

(a) Adequate books of account for all REIMBURSABLE PROJECTS provided under this Agreement shall be maintained by the SUBCONTRACTOR in accordance with applicable generally accepted accounting principles consistently applied and such books of account may be examined by either of the PARTIES at any and all reasonable times. Said books and records will be kept in the offices of the SUBCONTRACTOR.

(b) One uniform account system shall be employed for all books of account and the books of account shall truly and correctly reflect all transactions affecting this Agreement.

(c) Nothing in this Agreement shall be construed to give any PARTY the right to examine or compel the disclosure of any books of account or others records of the other PARTY, or any information contained herein.

## TAXES

Each PARTY shall be solely responsible for any taxes, fees, or other charges levied or imposed by the United States Government or by any other jurisdiction directly on it or on its revenues from or its share of any PROFIT.

## FINAL ACCOUNTING, SETTLEMENT AND TERMINATION

(a) Upon completion of, and receipt of final payment under the PRIME CONTRACT, a final accounting, including a balance sheet and statement of profit and loss on all REIMBURSABLE PROJECTS will be prepared and submitted to each PARTY.

(b) After paying or providing for payment of all liabilities, including liabilities to the PARTIES as shown on such balance sheet, after establishing reserves for contingent liabilities in such amounts as both PARTIES shall determine, and after the final settlement statement has been prepared and signed as specified in the following paragraph (C), any REIMBURSABLE PROJECT funds remaining to the credit of the PARTIES shall be distributed to the PARTIES in the proportions as specified in INTERESTS OF THE PARTIES. If REIMBURSABLE PROJECT operations have resulted in a loss, the PARTIES shall cover such loss in their respective values as specified in INTERESTS OF THE PARTIES and will contribute in such proportions any funds required to satisfy its remaining liabilities.

(c) Before taking any distribution under the preceding paragraph (b); or before the PARTIES are required to contribute funds to cover any loss, whichever is the case, a final settlement statement shall be prepared showing all REIMBURSABLE PROJECT

Subcontractor Initials          Prime Contractor Initials          10 of 16          Contract 2016-01

revenues received, all costs paid or accrued, any reserves established for contingent liabilities, all initial working capital advances and repayments, and all distributions of PROFIT, if any, to the PARTIES. When the PARTIES have agreed as to the correctness of such statement, each of them will sign it and will release the other PARTY from any and all claims under this Agreement, except that the PARTIES will retain (i) their respective interests, in the proportions in any portion of such contingency reserves which is not required to meet liabilities and (ii) their respective rights of contributions against the other PARTY in the event that such contingency reserves are insufficient to meet all liabilities.

(d) Whenever both PARTIES determine that all or any part of any REIMBURSABLE PROJECT reserves for contingent liabilities is no longer required for such purpose, such reserve or part thereof shall be distributed to the PARTIES in the portions specified in INTERESTS OF THE PARTIES.

(e) When all known REIMBURSABLE PROJECT contingent liabilities have been discharged or otherwise satisfied and any contingent reserves remaining thereafter have been distributed to the PARTIES, both PARTIES shall terminate this Agreement, and no PARTY shall thereafter have any rights against or liability to the other PARTY under this Agreement, except as expressly provided elsewhere herein and except that their respective rights of contribution with the operations of the PARTIES which could or might be made against any PARTY have been barred by the passage of time.

## ADDITIONAL REQUIREMENTS:

In the event that TK Services, Inc. is dissolved by a court order in bankruptcy proceedings, RWD agrees to contract with PSI Global, LLC as a management company on this project. At that time, PSI Global, LLC will continue to provide the same management support that TK Services, Inc. had provided, but RWD would be responsible for the financial obligations (payroll, materials, supplies, third party service contractors, etc.) of the contract. As compensation for this change in responsibility, RWD will receive 51% of the G&A/Profit generated and PSI Global, LLC will receive 49% of the G&A/Profit generated as specified in EXHIBIT "B".

Subcontractor Initials     Prime Contractor Initials     11 of 16     Contract 2016-01

# EXHIBIT B

**SUBCONTRACTOR:** PSI Global, LLC located at 5568 General Washington Drive, Suite A215, Alexandria, VA 22312

**CLIENT:** The Chimes

**FACILITY:** EPA-ICC located at 1201 Constitution Avenue NW, Washington DC 20004

**CONTRACT SERVICES:** SUBCONTRACTOR's SERVICES are a subset of the PRIME CONTRACTOR SERVICES and the full scope of CONTRACT SERVICES provided to CLIENT under the PRIME CONTRACT will herein be called "CONTRACT SERVICES".

**SUBCONTRACTOR SERVICES:**
SUBCONTRACTOR will perform all CONTRACT SERVICES jointly with PRIME CONTRACTOR following all PRIME CONTRACT provisions except those expressly intended for PRIME CONTRACTOR.

**TERM:** This AGREEMENT will become effective on the 1st day of To Be Determined, and will continue in effect until the last day of Option Year 4 or as provided in this AGREEMENT. If an Option Year TERM PERIOD is not renewed by CLIENT or a TERM PERIOD is shortened or extended for any reason by CLIENT, then this AGREEMENT will continue in effect until the last day of CONTRACT SERVICES. PRIME contractor acknowledges that EXHIBIT B with PSI is To be Determined and must be agreed upon by both parties. _____ (Subcontractor initials) _____ (Prime Contractor initials)

### TERM PERIODS
**Base Year** – To Be Determined
**Option Year 1** – To Be Determined
**Option Year 2** – To Be Determined
**Option Year 3** – To Be Determined
**Option Year 4** – To Be Determined

## FINANCIAL MANAGEMENT

### WORKING CAPITAL
(a) The initial working capital needed to meet the requirements of CONTRACT SERVICES shall be determined during the proposal preparation phase and shall be approved by both PARTIES.

(b) Within ten (10) days before the Start Date of CONTRACT SERVICES, each PARTY shall deposit its proportionate share of the initial working capital requirements in an Account agreed to by both PARTIES. Any amounts of additional working capital

Subcontractor Initials          Prime Contractor Initials

Contract 2016-01

advances required to perform CONTRACT SERVICES as determined by both PARTIES, will be provided by the PARTIES at the times and in the amounts determined. All working capital advances shall be repaid to the PARTIES before any distribution of PROFIT is made.

(c) Neither PARTY will withdraw any portion of their WORKING CAPITAL contribution without the express written consent of the other PARTY.

(d) No borrowing charge or loan interest will be due or payable to any PARTY on their agreed upon WORKING CAPITAL contribution inclusive of any agreed upon additional WORKING CAPITAL contribution.

## INCOME AND EXPENSES

The following items shall be considered expenses of the PARTIES in computing profits and losses.

(a) Ordinary and necessary costs and expenses, including General & Administrative (G&A) overhead (all without profit or other fee), incurred by either of the PARTIES as approved by both PARTIES in the performance of CONTRACT SERVICES.

(b) All costs and expenses incurred by either of the PARTIES directly in the performance of CONTRACT SERVICES. The PARTIES hereto shall agree to budgets and shall limit expenses to approved budget levels unless modified budgets are approved by both PARTIES.

## PAYMENT TERMS

**DISTRIBUTION OF FUNDS - GENERAL & ADMINISTRATIVE (G&A) COSTS:** Both PARTIES will jointly establish an ANNUAL BUDGET for G&A COSTS for each TERM PERIOD. Distribution of funds to reimburse each PARTY for G&A COSTS will be made Monthly to the respective PARTIES based upon the mutually agreed upon ANNUAL BUDGET. If any G&A COSTS are expected to exceed the ANNUAL BUDGET, then the additional expense will require both PARTIES authorization before the additional expense is paid.

**DISTRIBUTION OF FUNDS – DIRECT & INCEDENTAL COSTS:** Both PARTIES will jointly establish an ANNUAL BUDGET for DIRECT & INCEDENTAL COSTS for each TERM PERIOD. Distribution of funds to Suppliers and Vendors to pay for DIRECT & INCEDENTAL COSTS will be made directly to the Suppliers and Vendors from the joint Depository Account. If any DIRECT & INCEDENTAL COSTS are expected to exceed the ANNUAL BUDGET, then the additional expense will require both PARTIES authorization before the additional expense is paid.

**DISTRIBUTION OF FUNDS – REIMBURSABLE PROJECTS:** Each REIMBURSABLE PROJECT will be detailed by the Project Manager in conjunction with each of the PARTIES, including a complete REIMBURSABLE PROJECT BUDGET. Distribution of funds to reimburse each PARTY for G&A COSTS will be made Monthly to the respective PARTIES

Subcontractor Initials          Prime Contractor Initials                    Contract 2016-01

13 of 16

after the CLIENT remits payment for the REIMBURSABLE PROJECT. Distribution of funds to Suppliers and Vendors to pay for DIRECT & INCEDENTAL COSTS will be made directly to the Suppliers and Vendors from the joint Depository Account. If any G&A COSTS and/or DIRECT & INCEDENTAL COSTS are expected to exceed the REIMBURSABLE PROJECT BUDGET, then the additional expense will require both PARTIES authorization before the additional expense is paid.

## DISTRIBUTION OF FUNDS - PROFIT:

**INTERESTS OF THE PARTIES:** PRIME CONTRACTOR 51% / SUBCONTRACTOR 49%

Subject to any other provisions of this AGREEMENT, the net PROFITS and LOSSES of the PARTIES, for both accounting and tax purposes, will accrue to and be born by the PARTIES in the proportions outlined in the INTERESTS OF THE PARTIES.

Subject to any other provisions of this AGREEMENT, it is anticipated that Monthly distributions of PROFITS will be made to both PARTIES in the proportions outlined in the INTERESTS OF THE PARTIES. However, if there is an actual or projected shortfall in FUNDS to cover G&A COSTS, DIRECT & INCEDENTAL COSTS, and/or REIMBURSABLE PROJECTS, PROFIT will not be distributed to either PARTY until such shortfall is mitigated.

## BANKING AND FINANCE

All banking and finance arrangements for this Agreement will adhere to the following conditions:

   (e) All funds received for CONTRACT SERVICES in any form, and from any source, shall be deposited directly into a Depository Account to be opened and maintained jointly in the name of both PARTIES, with such Financial Institution as the PARTIES shall agree upon.

   (f) The opening of the Depository Account and the designation of signatories with respect thereto shall be authorized or confirmed by appropriate action of the management of each PARTY, provided that the signature of all the signatories, or their designees, will be required for all checks and drafts drawn on, and all other transactions with respect to the Depository Account.

   (g) All payments due to each PARTY for performance of CONTRACT SERVICES will be deposited in their respective Depository Account.

   (h) No PARTY may borrow money upon, or otherwise pledge or commit, the credit of the other PARTIES without its prior and express written consent.

## TRANSACTIONS WITH THE PARTIES

   (a) It is anticipated that the PARTIES may assign personnel from their respective organizations to fill management and support staff positions.

Subcontractor Initials    Prime Contractor Initials

Contract 2016-01

(b) Assignments of personnel to CONTRACT SERVICES by the PARTIES shall be subject to the approval of, and shall be made in accordance with the written authorizations of both PARTIES.

(c) Except as may be approved by both PARTIES, no PARTY shall make any charge to the other PARTY for any cost incurred in connection with the assignment of personnel to, or the performance of CONTRACT SERVICES which is not an allowable cost under the Agreement, nor shall any joint PARTY funds be applied to the payment of any such cost. Unless approved by both PARTIES, if any cost is charged to and paid, but is subsequently determined by audit to be a non-allowable cost, in whole or in part, the amount disallowed shall be promptly repaid to the joint PARTY Depository Account.

## ACCOUNTING AND RECORDS

(d) Adequate books of account for all CONTRACT SERVICES provided under this Agreement shall be maintained by the SUBCONTRACTOR in accordance with applicable generally accepted accounting principles consistently applied and such books of account may be examined by either of the PARTIES at any and all reasonable times. Said books and records will be kept in the offices of the SUBCONTRACTOR.

(e) One uniform account system shall be employed for all books of account and the books of account shall truly and correctly reflect all transactions affecting this Agreement.

(f) Reports of the financial condition and the progress of CONTRACT SERVICES shall be made by the SUBCONTRACTOR to each PARTY monthly and at such other times as may be reasonably requested.

(g) Nothing in this Agreement shall be construed to give any PARTY the right to examine or compel the disclosure of any books of account or others records of the other PARTY, or any information contained herein.

## TAXES

Each PARTY shall be solely responsible for any taxes, fees, or other charges levied or imposed by the United States Government or by any other jurisdiction directly on it or on its revenues from or its share of any PROFIT.

## FINAL ACCOUNTING, SETTLEMENT AND TERMINATION

(f) Upon completion of, and receipt of final payment under the PRIME CONTRACT, a final accounting, including a balance sheet and statement of profit and loss, of CONTRACT SERVICES operation will be prepared and submitted to each PARTY.

(g) After paying or providing for payment of all liabilities, including liabilities to the PARTIES as shown on such balance sheet, after establishing reserves for contingent liabilities in such amounts as both PARTIES shall determine, after disposing or arranging for the disposition of all joint PARTY non-cash assets and property, and after the final settlement statement has been prepared and signed as specified in the following paragraph (C), any funds remaining to the credit of the PARTIES shall be distributed to

Subcontractor Initials          Prime Contractor Initials

15 of 16

Contract 2016-01

the PARTIES in the proportions as specified in INTERESTS OF THE PARTIES.   If CONTRACT SERVICE operations have resulted in a loss, the PARTIES shall cover such loss in their respective values as specified in INTERESTS OF THE PARTIES and will contribute in such proportions any funds required to satisfy its remaining liabilities.

(h)   Before taking any distribution under the preceding paragraph (b), or before the PARTIES are required to contribute funds to cover any loss, whichever is the case, a final settlement statement shall be prepared showing all revenues received, all costs paid or accrued, any reserves established for contingent liabilities, all initial working capital advances and repayments, and all distributions of PROFIT, if any, to the PARTIES. When the PARTIES have agreed as to the correctness of such statement, each of them will sign it and will release the other PARTY from any and all claims under this Agreement, except that the PARTIES will retain (i) their respective interests, in the proportions in any portion of such contingency reserves which is not required to meet liabilities and (ii) their respective rights of contributions against the other PARTY in the event that such contingency reserves are insufficient to meet all liabilities.

(i)   Whenever both PARTIES determine that all or any part of any reserve for contingent liabilities is no longer required for such purpose, such reserve of part thereof shall be distributed to the PARTES in the portions specified in INTERESTS OF THE PARTIES.

(j)   When all known contingent liabilities have been discharged or otherwise satisfied and any contingent reserves remaining thereafter have been distributed to the PARTIES, both PARTIES shall terminate this Agreement, and no PARTY shall thereafter have any rights against or liability to the other PARTY under this Agreement, except as expressly provided elsewhere herein and except that their respective rights of contribution with the operations of the PARTIES which could or might be made against any PARTY have been barred by the passage of time.



Subcontractor Initials          Prime Contractor Initials

Contract 2016-01