# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TK SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1152 (ABJ) |
| | ) | |
| RWD CONSULTING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff TK Services, Inc. ("TKS") has brought this breach of contract action against defendant RWD Consulting, LLC ("RWD"). TKS alleges that RWD wrongfully breached an agreement between the parties by excluding it from working on a government contract, and that RWD converted TKS's property by unlawfully removing contract funds belonging to TKS from a jointly controlled bank account. Compl. [Dkt. # 1]. After the complaint was filed, TKS filed a motion for a preliminary injunction. Pl.'s Mot. for Prelim. Inj. [Dkt. # 2] ("PI Mot."); Mem. of P. & A. in Supp. of Mot. [Dkt. # 2] ("PI Mem."). Defendant opposed the motion, Mem. of P. & A. in Opp. to PI Mot. [Dkt. # 10] ("PI Opp."), and it also filed a motion to dismiss and to compel arbitration. Def.'s Mot. to Dismiss Pl.'s Compl. & Compel Arb. [Dkt. # 8] ("Def.'s Mot."). Plaintiff filed a reply in support of its motion for a preliminary injunction, and an opposition to the motion to dismiss and to compel arbitration. Pl.'s Reply Br. in Supp. of PI Mot. [Dkt. # 12] ("Pl.'s Reply"); Mem. of P. & A. in Resp. to Def.'s Mot. [Dkt. # 13] ("Pl.'s Opp."). For the reasons set forth below, the Court concludes that the arbitration agreement is enforceable, that TKS must arbitrate its claims against RWD, and that TKS is not entitled to an injunction in aid of the

arbitration. Therefore, it will grant defendant's motions to dismiss and compel arbitration, and it will deny the motion for a preliminary injunction as moot.

## BACKGROUND

TKS is a Virginia corporation; its business is government contracting, and it specializes in providing engineering, maintenance, and operational services for government facilities managed by the General Services Administration. Compl. ¶ 7. In early 2016, TKS began to discuss a proposal with RWD, a Virginia company owned and managed by Robert W. Dozier, Jr., to provide operations and maintenance services for the EPA headquarters located at 1201 Constitution Avenue NW in Washington. *Id.* ¶ 9. TKS was aware of the opportunity because it was the incumbent subcontractor at the time, working as a subcontractor to Chimes DC. *Id.*

On February 23, 2016, in anticipation of RWD's receiving a subcontract from Chimes, TKS and RWD entered into a Mentor Subcontractor's Service Agreement. Compl. ¶ 11; Decl. of Robert Dozier, Jr. [Dkt. # 10-1] ("Dozier Decl.") ¶ 7; Ex. A to Compl. [Dkt. # 1] ("Mentor Agreement"). On July 1, 2016, Chimes awarded a subcontract to RWD, which the parties refer to as the "Chimes Contract." Compl. ¶ 12; Dozier Decl. ¶ 9. Under the Chimes Contract, RWD became the prime subcontractor responsible for providing operation and maintenance-related services for the EPA building. Compl. ¶ 12; Dozier Decl. ¶ 9. TKS and RWD then agreed that any work performed under the Chimes Contract would be performed in accordance with the Mentor Agreement. Compl. ¶ 12; Dozier Decl. ¶ 9.

Under the Mentor Agreement, TKS was responsible for managing the work required by the Chimes Contract. Compl. ¶ 16; Dozier Decl. ¶ 15; Mentor Agreement at 8. TKS would receive all of the profits under the Chimes Contract, but it was required to pay RWD a fee of $5,000 per month. Compl. ¶ 16; Dozier Decl. ¶ 21; Mentor Agreement at 9.

The Mentor Agreement required that all funds received under the Chimes Contract were to be deposited into a joint bank account to which both TKS and RWD were signatories. Compl. ¶ 17; Dozier Decl. ¶ 10; Mentor Agreement at 9. Money could only be withdrawn from the joint account under the terms provided for in the Mentor Agreement. Compl. ¶ 17; Mentor Agreement at 9–10. TKS alleges that it was entitled to a payment of $275,051.47 for the profits attributable to the Chimes Contract, but that it was only paid $210,000. *Id.* ¶ 20.[1]

The contract also provided that TKS was required to provide "working capital" for the work to be done on the Chimes Contract, and the agreement prohibited RWD from withdrawing any portion of those funds. Mentor Agreement at 8. TKS alleges that it contributed over $140,000 in working capital to the joint account. Compl. ¶ 18.

The Mentor Agreement also governed the distribution of profits arising from "reimbursable projects" that were separate from the Chimes Contract. Mentor Agreement at 9. Fifty-one percent of those profits were to be distributed to RWD, and forty-nine percent of the profits were to be distributed to TKS. *Id.* TKS alleges that it is entitled to its share of those profits for the period between July 1, 2016 and March 24, 2017, which it calculates to be $38,121.13. Compl. ¶ 22. The complaint states that TKS has not been paid its share of the profits for the reimbursable projects. *Id.*

TKS also alleges that it supplied equipment valued in excess of $22,500 that was to be used to fulfill the parties' obligations under the Chimes Contract. Compl. ¶ 23.

---

1   The Chief Executive Officer of RWD, Robert Dozier, states in a declaration that TKS held a debit card for the joint account, and that the Special Controller for TKS, William Arnold, signed all checks related to the joint account. Dozier Decl. ¶¶ 2, 11. RWD's principal also avers that it was this TKS employee that was "responsible for protecting TKS' interest in the Deposit Account and ensuring that TKS received its share of profits and distributions under the Agreement." *Id.*

According to TKS, on March 23, 2017, without prior warning or notice, RWD withdrew all of the funds from the joint account – a total of approximately $35,000 – and it terminated TKS's online access to the joint bank account. Compl. ¶ 24. TKS alleges that RWD took actions to exclude TKS from accessing the EPA building, and that RWD took steps to unilaterally terminate the Mentor Agreement. *Id.* ¶ 25.[2] Based on these facts, TKS sued for breach of contract on June 13, 2017, and it states that – in addition to the value of its equipment – it is entitled to a minimum of $34,000 per month of profit for the months of March and April 2017, and that it continues to be damaged in that amount for each month that it is excluded from the EPA building. *Id.* ¶¶ 29–31.

Count I of the complaint alleges that RWD breached the Mentor Agreement by unilaterally terminating it, and by not properly compensating TKS. Compl. ¶¶ 32–39. In Count II, TKS alleges that RWD is liable for conversion of funds that rightfully belong to TKS. *Id.* ¶¶ 40–51. Count III alleges that RWD has been unjustly enriched by its improper conduct. *Id.* ¶¶ 52–59. And Count IV requests equitable and injunctive relief, including an accounting, an award of pre-judgment attachment of funds, and an injunction that requires the profits from the Chimes Contract to be sequestered, prevents RWD from excluding TKS from the EPA building and from the joint bank account, and reinstates TKS to its prior role under the Mentor Agreement. *Id.* ¶¶ 60–66. Pursuant to Federal Rule of Civil Procedure 62, TKS filed a motion for a preliminary injunction based on the same factual allegations. PI Mot.

---

[2] RWD paints a different picture in its pleadings. In a declaration submitted in opposition to the motion for preliminary injunction, Robert Dozier, the Chief Executive Officer of RWD, avers that the termination of the contract was due to complaints about TKS's management of the payroll system, and its failure to address certain issues at the EPA building. Dozier Decl. ¶¶ 18, 20. RWD admits that it terminated TKS's access to the joint account, Dozier Decl. ¶ 29, but it contests the allegation that it did so without notice. *See id.* ¶ 18.

The complaint and motion for preliminary injunction are premised upon the Mentor Agreement, but the contract contains an arbitration clause:

> **ARBITRATION**. Any controversy or claim between the PARTIES arising out of or in connection with this Agreement, including any claim concerning an alleged breach hereof, shall be subject to final settlement by arbitration. Notice of demand by any PARTY for arbitration of any matter must be given to the other PARTIES within one (1) year from the date on which the controversy occurred or the claim arose.
>
> The arbitration shall be conducted by a single arbitrator in accordance with the Rules of Arbitration of the American Arbitration Association, as then in effect. If and to the extent that it is necessary or appropriate to refer to and apply the law of a particular jurisdiction in reaching a decision on any matter submitted to arbitration under this clause, the arbitrator shall be authorized and directed to refer to and apply the laws of the State where the FACILITY is located.
>
> The award rendered by the arbitrator shall be final and binding on all PARTIES and judgment may be entered upon such award by any court having jurisdiction over the PARTY against which the award is sought to be enforced. In no event shall this paragraph be construed as conferring upon any court authority to inquire into and review any such award on its merits. Each PARTY shall bear its own costs in connection with any arbitration proceedings, except that fees or other charges of the arbitrator or of the American Arbitration association shall be borne equally by the Parties.

Mentor Agreement ¶ 11.

## STANDARD OF REVIEW

### I. Motion to compel arbitration

By enacting the Federal Arbitration Act, Congress adopted "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon any grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, since arbitration is a matter of contract, parties cannot be compelled to arbitrate their

disputes unless they have agreed to do so. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). When one party resists arbitration, the opposing party may petition any United States district court that would otherwise have subject-matter jurisdiction "for an order directing that such arbitration proceed in the manner provided for in [their written arbitration] agreement." 9 U.S.C. § 4. When presented with such a motion, the court should bear in mind that the FAA creates a strong presumption favoring the enforcement of arbitration agreements, and that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25.

"The Supreme Court has set out 'the proper framework for deciding when disputes are arbitrable.'" *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n, AFL–CIO v. Liberty Mar. Corp.*, 815 F.3d 834, 844 (D.C. Cir. 2016), quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). "Under that framework, a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Id.* (emphasis in original).

Though defendant's motion is styled as a motion to dismiss, a motion that seeks to compel or preclude arbitration is evaluated under the summary judgment standard. *Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008). "How the parties style the motion seeking arbitration is not determinative." *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 99 (D.D.C. 2004), *aff'd*, 413 F.3d 77 (D.C. Cir. 2005). Under this standard, the party seeking to compel arbitration must first present "evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Haire v. Smith, Currie & Hancock LLP*, 925 F. Supp. 2d 126, 129 (D.D.C. 2013), quoting *Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84, 89 (D.D.C. 2012). "The burden then shifts to [the non-moving party] to show that there is a genuine issue of material fact as to the

making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." *Hill*, 865 F. Supp. 2d at 89. The Court will compel arbitration if the pleadings and the evidence show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Booker*, 315 F. Supp. 2d at 99, quoting Fed. R. Civ. P. 56(c).

II.     **Motion for a preliminary injunction**

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citations omitted). To obtain a preliminary injunction, a plaintiff must make a "clear showing that [it] is entitled to such relief" by establishing that: 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in its favor; and 4) an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008).

The manner in which courts should weigh the four factors "remains an open question" in this circuit. *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). This Circuit has long adhered to the "sliding scale" approach, where "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). But because the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements," the Court of Appeals has "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Id.* at 392–93, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring). The D.C. Circuit has not yet decided whether the "'sliding scale' approach remains valid after *Winter*." *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

7

In any event, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been "[t]he basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959). A failure to show irreparable harm is grounds for the court to refuse to issue a preliminary injunction, "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also GEO Specialty Chems., Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013) ("[A] court may refuse to issue an injunction without considering any other factors when irreparable harm is not demonstrated.").

**ANALYSIS**

There is no dispute in this case that the parties entered into an enforceable agreement to arbitrate. The contract plaintiff attached as an exhibit to its own motion for preliminary injunction contains the binding arbitration clause, *see* Mentor Agreement ¶ 11, and plaintiff concedes that the clause covers all of the claims in its complaint, except for Count IV, which requests equitable relief. Pl.'s Opp. at 5 ("Plaintiff acknowledges that the counts for breach of contract, unjust enrichment, and conversion that are set forth in the Complaint are subject to arbitration."). But plaintiff urges the Court to reach the merits of the motion for a preliminary injunction anyway, arguing that the arbitration clause "does not specifically address injunctive or other equitable relief, and it does not provide that arbitration is the sole and exclusive forum for determination of interim injunctive relief." *Id.* at 4.

This argument is not consistent with the broad, clear, mandatory language of the arbitration clause. The parties agreed that "[*a*]*ny* controversy or claim between the [parties] arising out of or in connection with this Agreement, including *any* claim concerning an alleged breach . . . *shall* be

8

subject to final settlement by arbitration." Mentor Agreement ¶ 11 (emphasis added). So the fact that claims for injunctive relief are not specifically mentioned does not lead to the conclusion that they were carved out; the plain reading of the provision suggests that any carve out had to be explicit.

This conclusion is bolstered by the fact that an exception for injunctive relief was not necessary because the rules of the arbitral forum provide for interim and injunctive relief. The American Arbitration Association ("AAA") – the entity to which the parties agreed in the Mentor Agreement to submit disputes – has promulgated rules that govern its arbitrations, including that "[a] party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis." Am. Arb. Ass'n., Commercial Arbitration Rules & Mediation Process at 24 (Oct. 1, 2013), https://adr.org/sites/default/files/document_repository/ Commercial%20Rules.pdf; *see also* Mentor Agreement ¶ 11 ("The arbitration shall be conducted by a single arbitrator in accordance with the Rules of Arbitration of the American Arbitration Association, as then in effect.").

Plaintiff also contends that the Court has the power to enter an injunction to maintain the status quo while the arbitration is pending. Pl.'s Opp. at 5–6. But the cases cited by plaintiff limit that authority to particular circumstances, and they call for a showing in addition to, and different from, the sort of harm that would support preliminary injunctive relief. "When the parties have agreed to arbitrate a dispute, a court may issue an injunction if, in addition to the usual equitable concerns, the integrity of the arbitration process would be threatened absent interim relief." *Am. Postal Workers Union, AFL-CIO v. USPS*, 372 F. Supp. 2d 83, 90–91 (D.D.C. 2005), quoting *Int'l Bhd. of Elec. Workers, Local 1900 v. PEPCO*, 634 F. Supp. 642, 643 (D.D.C. 1986). "[A]n

9

injunction in aid of arbitration is appropriate . . . *only when* the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration." *Id.* at 91, quoting *Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276, 286 (7th Cir. 1981).

Plaintiff has not begun to make the necessary showing – indeed, it does not expressly argue that there is some threat to the arbitration itself. In its memorandum in support of the motion for a preliminary injunction plaintiff makes a passing statement that RWD is "permanently dissipating the source of funds intended for payment to TKS." PI Mem. at 5–6. But this unsupported conclusory allegation does not constitute evidence that the integrity of the arbitration is at risk or that RWD will be unable to fund an eventual award.

Plaintiff posits that the arbitration process will be "essentially meaningless" absent an injunction because TKS will suffer irreparable harm in the meantime. Pl.'s Opp. at 6. But a showing of irreparable harm is one of the "usual equitable concerns" that a party seeking an injunction must establish *in addition* to the threat to the arbitration; it is not an independent reason in support of an injunction in aid of arbitration. And, as noted above, if plaintiff is in dire financial straits, it is free to seek interim relief from the arbitrators.

Moreover, it is not at all clear that TKS has met its burden to establish irreparable harm. "First, the harm must be 'certain and great,' 'actual and theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm.' Second, the harm 'must be beyond remediation.'" *Newby*, 838 F.3d at 7–8, quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Plaintiff argues that it has suffered irreparable harm based on "[t]he loss of funds and equipment, the loss of access to the [EPA building], and the continued bad acts by the Defendant

in depriving TKS of its lawfully owned property." PI Mem. at 8. But because economic losses are seldom beyond remediation, "[i]t is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Davis*, 571 F.3d at 1295. Economic loss can constitute irreparable injury only in limited circumstances: where "monetary loss . . . threatens the very existence of the movant's business," *Wis. Gas.*, 758 F.2d at 674, or where the claimed economic loss is "certain, imminent, and unrecoverable." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011); *see also Sterling Comm. Credit–Mich., LLC v. Phx. Indus. I, LLC*, 762 F. Supp. 2d 8, 15 (D.D.C. 2011) ("The critical consideration under this exception is the effect that the purported economic harm will have on a movant's business or its very existence – not any monetary amount *per se*.").

In support of its motion for preliminary injunction, plaintiff submitted the declaration of Chief Executive Officer James Kim, who predicted that because "[t]he income from the Mentor Agreement constitutes a large percentage of TKS's overall revenues[,] [w]ithout this income, TKS will be forced to go out of business in a matter of months." Verified Statement of James Kim, Ex. B to PI Mot. [Dkt. # 2] ¶ 28. This did little to make the necessary showing of a threat to the company's very existence, but plaintiff submitted additional detail concerning its finances in its reply.

Plaintiff's financial records show that the loss of the revenue from the contract with RWD will diminish its projected total annual revenue by 17.68%. *See* Ex. A to Verified Statement of William Arnold [Dkt. # 12-1]. "A claim of substantial financial losses must be evaluated from the perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief." *ConverDyn v. Moniz,* 68 F. Supp. 3d 34, 48 (D.D.C. 2014), and the losses in plaintiffs' projections do not necessarily rise to the level of irreparable harm. *See*

11

*Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (finding that a reduction of approximately 24% of the plaintiff's funding would not constitute irreparable harm).

Plaintiff presented additional evidence showing that without the income from the subcontract at issue, it will be facing a negative cash flow situation as of August 2017, and this will affect plaintiff's ability to meet its obligations under a Chapter 11 Reorganization plan filed in the U.S. Bankruptcy Court for the Eastern District of Virginia. Verified Statement of William Arnold, Ex. 1 to Pl.'s Reply [Dkt. # 12-1] ¶¶ 12–13. But the force of plaintiff's request that the Court respond to this claimed emergency is undermined by plaintiff's own delay in bringing a lawsuit. While TKS alleges that the contract was breached on March 23, 2017, it waited until June 13, 2017 – almost three months later – to file its complaint and motion for preliminary injunction, and it assumed the risk of further delay by choosing this forum in the face of the binding arbitration clause. *See, e.g.*, *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding a 44-day delay in bringing a motion for injunctive relief to be "inexcusable"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.").[3] Moreover, defendant RWD has come forward with evidence that undercuts plaintiff's

---

3 Plaintiff also contends that, in addition to economic damages, it has suffered "damage . . . to [its] business reputation." Pl.'s Mem. at 9. ("[I]n refusing to honor RWD's legal, contractual obligations . . . TKS's business reputation continues to be harmed. Chimes and other government contractors are all parties with whom TKS continuously conducts business. It has nurtured and now greatly relies upon these critical relationships to be able to conduct business. Should those relationships continue to be damaged, TKS will be irreparably harmed."). But this allegation is wholly conclusory, and it is not a sufficient basis for extraordinary injunctive relief. *See Sampson*, 415 U.S. at 90–91; *Trudeau v. FTC*, 384 F. Supp. 2d 281, 296–97 (D.D.C. 2005) (holding that "the showing of reputational harm must be concrete and corroborated, not merely speculative").

characterization of its financial circumstances. *See* Def.'s Opp. at 14–15. But ultimately, the Court need not resolve these factual questions because it has come to the firm conclusion that it may not.

In the end, the answer to the question posed by the motion to compel arbitration and the opposition becomes clear upon a review of the proposed order that plaintiff would have the Court enter, supposedly "to maintain the status quo."[4] Plaintiff has submitted a seven page proposed injunction, which is chock full of findings about the terms of the contract and the strength of plaintiff's allegations concerning RWD's alleged breach. *See* Proposed Order [Dkt. # 14] ¶ 5 ("Plaintiff has properly alleged, and supported by verified statement(s), that Defendant's termination of Plaintiff under the Mentor Agreement was effected without notice expressly required under the terms and conditions of such agreement."). And the order would impose the following requirements, among others:

> A. Defendant shall immediately reinstate Plaintiff to, and Plaintiff should thereafter perform, its operational and financial oversight and management of the building operational and maintenance related services provided for the EPA Building.
>
> B. Plaintiff shall perform all contract services required at the EPA Building except those expressly intended for Defendant.
>
> . . .
>
> G. From time to time, follow on or supplemental work may be ordered or requested with respect to the EPA Building ("Reimbursable Projects").

---

4     A preliminary injunction is ordinarily sought to preserve the status quo pending the resolution of the underlying litigation. *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 126 (D.D.C. 2006). It is questionable whether the proposed injunction can fairly be characterized as such an order since plaintiff, which has not been working at the EPA's headquarters since late March, is asking to be "reinstated." Proposed Order at 5. Courts have held that a preliminary injunction that would change the status quo is an even more extraordinary remedy. *Exxon Mobil Corp.*, 429 F. Supp. 2d at 126–27; *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) ("In this Circuit, the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised."), quoting *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000).

> Income generated or received with respect to each and any such Reimbursable Project shall be distributed as follows:
>
>> a. All G&A, direct costs and incidental costs associated with a Reimbursable Project shall first be paid to Plaintiff on a monthly basis after receipt of payment for services.
>>
>> b. The net profits from any Reimbursable Project shall thereafter accrue to the parties in the following percentages: 51% to Defendant and 49% to Plaintiff, with such profits being distributable on a monthly basis after payment of all G&A, direct and indirect expenses associated with each such Reimbursable Project.

Proposed Order at 5–6.

While the Eighth Circuit stands alone in its view that any preliminary injunction in aid of arbitration would be prohibited, the Court agrees with that court's observation that "the judicial inquiry requisite to determine the propriety of injunctive relief necessarily would inject the court into the merits of issues more appropriately left to the arbitrator." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1292 (8th Cir. 1984). The four-pronged analysis necessary under Rule 65, and particularly, the inquiry TKS is asking the Court to undertake in order to grant the specific relief it is seeking here, is a merits based inquiry. Since the merits of the contract dispute and the preliminary injunction requested in this case are inextricably intertwined, the Court cannot treat the motion for a preliminary injunction separately from the complaint to which it is attached, and it must dismiss the case. For all of these reasons, the motion to compel arbitration will be granted, and the motion for a preliminary injunction will be denied as moot.

*[signature: Amy B Jackson]*

AMY BERMAN JACKSON
United States District Judge

DATE: June 23, 2017